**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2014 SEP -8 PM 3: 36

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
            DEPUTY

GLOBAL   SESSIONS   LP;   and   GLOBAL
SESSIONS HOLDINGS SRL,
                            Plaintiffs,

-vs-                                                   Case No.  A-13-CA-691-SS

COMERICA BANK,
                            Defendant.

_____

GLOBAL SESSIONS LP; and GLOBAL
SESSIONS HOLDINGS SRL,
                            Plaintiffs,

-vs-                                                   Case No.  A-13-CA-692-SS

TD BANK  GROUP;  TORONTO-DOMINION
BANK; TD BANK US HOLDING COMPANY;
and TD BANK, N.A.,
                            Defendants.

_____

## CONSOLIDATED *MARKMAN* ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Plaintiffs Global Sessions LP and Global Sessions Holdings SRL (collectively, Global

Sessions)'s Opening Claim Construction Brief [#40],[1] Defendants Comerica Bank, TD Bank Group,

Toronto-Dominion Bank, TD Bank US Holding Company, and TD Bank, N.A.'s Opening Claim

Construction Brief [#41], Global Sessions's Response Brief [#43], Defendants' Response Brief

---

[1] Docket entry numbers refer to filings in Cause Number 13-CV-691. The parties agreed to consolidate these two cases for *Markman* purposes, and identical filings appear in both cause numbers.



[#44], Global Sessions's Post-*Markman* Opening Brief [#52], Defendants' Post-*Markman* Opening Brief [#53], Global Sessions's Post-*Markman* Response Brief [#54], Defendants' Post-*Markman* Response Brief [#55], the parties' Joint Chart of Disputed Terms for Claim Construction [#56], the Amended Report and Recommendation of the Special Master [#58], Global Sessions's Objections [#59], and Defendants' Objections [#60]. Having reviewed the documents, the governing law, the arguments of the parties at the *Markman* hearing, and the file as a whole, the Court now enters the following opinion and orders.

## Background

### I.     Procedural History

These two cases are patent infringement suits brought by Global Sessions against the various bank Defendants. At issue are two pairs of patents. The first pair, referred to as the "session state patents," includes United States Patent Numbers 6,076,108 (the '108 Patent), titled "System and Method for Maintaining a State for a User Session Using a Web System Having a Global Session Server," and 6,480,894 (the '894 Patent), a continuation of the '108 Patent. The second pair, referred to as the "customized dynamic content" or "hub" patents, includes United States Patent Numbers 6,085,220 (the '220 Patent), titled "Enterprise Interaction Hub for Managing an Enterprise Web System," and 6,360,249 (the '249 Patent), a continuation of the '220 Patent. All four patents share a single specification, with a few minor differences.[2]

The parties agreed to a consolidated technical tutorial and *Markman* hearing in both cause numbers. The Court, through Special Master Karl Bayer, held the consolidated *Markman* hearing

---

[2] For example, the abstracts of the '220 and '249 Patents differ from those of the '108 and '894 Patents, and the former patents also contain a few additional lines in the "Summary of the Invention" section, added during prosecution.

on June 11, 2014. Following the *Markman* hearing, the parties submitted additional briefing. The Special Master issued his Amended Report and Recommendation on claim construction on August 13, 2014. To the extent the parties have made specific objections to the Special Master's factual findings or legal conclusions, they are entitled to de novo review of those findings and conclusions. FED. R. CIV. P. 53(f).

## II.    Patent Descriptions

The patents-in-suit were prosecuted and issued in the late 1990s and early 2000s, a time when a relatively young Internet was being transformed into an e-commerce platform. The session state patents are focused on the idea of "state," a concept well known in the industry at the time of the invention. "State" generally describes the "context" of a user's interaction with a website. To use a modern example, online shopping carts track user "states" and remember what items users place in their carts, even when users navigate between and among many different webpages across single or multiple visits.

The industry standard communication protocol used in web communications, HyperText Transfer Protocol (HTTP), is a "stateless" protocol, meaning it does not track user states by default. To solve the problems caused by statelessness, early web systems tracked user states on individual web servers. As websites grew in popularity and web systems were decentralized and expanded across multiple servers, individually tracking user states became unwieldy and problematic. The session state patents claim a system and method for maintaining user states using a "global session server" distinct from any particular web system or web server. The global session server allows web systems to track user states and use any number of web servers to dispatch content to users, rather than tying specific users to specific servers tracking their specific state. By drawing upon user states

tracked by the global session server, individual web servers can remain stateless and respond to user requests without regard to whether that particular user had been served by that web server in the past.

The hub patents focus on the use of an "interaction hub" made up of multiple layers, with each layer performing a specific function. For example, a "presentation layer" determines how webpages are created and displayed to users, while a "trend collection layer" compiles data based on user activities on the website. According to the patents, this functional partitioning allows developers to more easily implement system-wide changes by altering the parameters of a single layer. Additionally, the trend collection layer can enable web systems to tailor content to specific users based on their expressed interests or histories using the website.

## Analysis

### I.    Claim Construction—Legal Standard

When construing claims, courts begin with "an examination of the intrinsic evidence, i.e., the claims, the rest of the specification and, if in evidence, the prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1327 (Fed. Cir. 2001).

The words in the claims themselves are of primary importance in the analysis, as the claim language in a patent defines the scope of the invention. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of

the patent application."[3] *Id.* at 1313. The inquiry into how a person of ordinary skill in the art understands a claim term provides an "objective baseline" from which to begin claim interpretation. *Id.* The person of ordinary skill in the art is understood to read a claim term not only in the context of the particular claim in which the term appears, but in the context of the entire patent, including the specification; thus, both the plain language of the claims and the context in which the various terms appear "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.

The specification also plays a significant role in the analysis. *Id.* at 1315. The Federal Circuit has repeatedly reaffirmed the principle that the specification "is always highly relevant . . . . Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In interpreting the effect the specification has on the claim limitations, however, courts must pay special attention to the admonition that one looks "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention, and not merely to limit a claim term." *Interactive Gift*, 256 F.3d at 1332 (internal quotation marks and citations omitted).

The final form of intrinsic evidence the Court may consider is the prosecution history. Although the prosecution history "represents an ongoing negotiation between the PTO and the applicant" and therefore "often lacks the clarity of the specification and thus is less useful for claim construction purposes," it can nonetheless "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

---

[3] This hypothetical person is now commonly referred to simply as an "ordinarily skilled artisan." *E.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1365–66 (Fed. Cir. 2013).

invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Aside from the intrinsic evidence, the Court may also consult "extrinsic evidence," which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* While extrinsic evidence "can shed useful light on the relevant art," the Federal Circuit has explained it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Extrinsic evidence in the form of expert testimony may be useful to a court for "a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. However, conclusory, unsupported assertions by an expert as to the definition of a claim term are not useful, and should be discounted. *Id.* In general, extrinsic evidence is considered "less reliable than the patent and its prosecution history in determining how to read claim terms," although it may be helpful. *Id.*

The purpose of claim construction is to "'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). Thus, "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *Id.* However, "district courts are not (and should not be) required to construe *every* limitation present in a patent's

asserted claims." *Id.* at 1362. For example, no construction is required if the requested construction would be "'an obligatory exercise in redundancy,'" or if the "disputed issue [is] the proper application of a claim term to an accused process rather the scope of the term." *Id.* (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

## II.   Application

## A.   Special Master's Recommendations

The Special Master's recommended constructions are as follows:

| Claim Term | Recommended Construction |
| --- | --- |
| "a state of a user session" and "a state of the user session" ('108 Patent, Claims 1, 12; '894 Patent, Claims 1, 5–6, 10–12) | No construction necessary. |
| "single set of session data representing a state of the user session" and "single set of session data representing a state of the user session" ('108 Patent, Claims 1, 12; '894 Patent, Claims 5, 10, 12) | One set of information reflecting the history during the "user session" of the user's requests and the responsive webpages. This set may exist in both a master copy and multiple shadow copies. |
| "global session server" and "session server" ('108 Patent, Claims 1, 6, 10, 12, 17, 21; '894 Patent, Claims 5, 6, 10, 12) | Server that stores and provides session data and that is sufficiently separate from the web system engines of the web system, either physically or logically, such that the web system engines remain stateless. |
| "web system engine" ('108 Patent, Claims 1, 9, 12, 20; '894 Patent, Claims 1, 2, 5–7, 10–12) | One or more components of a web system forming a unit that services requests dynamically for web content from users and returns web pages in response. |

| | |
|---|---|
| "layer"<br><br>('220 Patent, Claims 1, 4–6; '249 Patent, Claims 1–4, 6, 9, 12) | An identifiable component or an identifiable set of associated components configured to perform an identified function; where each identified layer is functionally insulated from other identified layers. |
| "business layer"<br><br>('220 Patent, Claims 1, 5; '249 Patent, Claims 1, 2, 6, 9, 12) | The layer that provides the business logic for the web system. |
| "business logic"<br><br>('220 Patent, Claim 1; '249 Patent, Claims 1–2, 6, 9) | Business rules of the web system. |
| "session state information"<br><br>('220 Patent, Claim 8) | No construction necessary. |
| "existing legacy data"<br><br>('220 Patent, Claim 1; '249 Patent, Claim 1, 4, 7, 10) | Data created or maintained prior to the user session by a computer system/software outside of the web system. |
| "profile data"<br><br>('220 Patent, Claim 1; '249 Patent, Claims 1, 2, 6, 9) | Collection of data reflecting users' interests and interactions with the web system. |
| "historical information"<br><br>('220 Patent, Claim 1; '249 Patent, Claims 1, 2, 6, 9) | No construction necessary. |

To the extent the parties have not objected to the Special Master's constructions of certain claim terms, the Court accepts the Special Master's recommendations as to those claim terms without further comment. These terms are: "layer"; "business layer"; "business logic"; "session state information"; "profile data"; and "historical information."

**B.      Objections**

The Court now turns to the parties' specific objections.

**1.      "a state of a user session" and "a state of the user session"**

The Special Master concluded no construction was necessary for these terms. This was the position taken by Defendants in their opening brief. *See* Defs.' Op. Br. [#41], at 26 (proposing no construction because the term "was a well-understood term of art at the time of the alleged invention"). Defendants now abandon that position and object to the lack of a construction, arguing the term must be construed to mean "all data associated with a user session that is necessary to maintain the context of the user session."

The concept of state is central to the session state patents, but was not invented by the patentee. The patents open with a discussion of the concept of state, the inherent problem of stateless HTTP, and the idea of tracking state across multiple user requests. *See, e.g.*, '108 Patent, col.1 ll.23–62. The patents even criticize then-current implementations of state-tracking tied to individual web servers. *Id.* col.1 l.63–col.2 l.6. This historical discussion shows ordinarily skilled artisans at the time of the invention would readily understand what the "state of a user session" meant.

Although Defendants insist there is a claims construction dispute here, the Court sees only infringement arguments. There are a potentially infinite number of possible state variables in any given system—time of access, IP address, user operating system, previous pages visited, items selected by user, and so on. The Special Master explained any construction requiring a system to track "all" state information across requests is overly broad, because some implementations of the invention may not need to track every variable to accurately retain the context of a specific user's session. *See* Markman Tr. [#51], at 67–68. Acknowledging this concern, Defendants modified their

post-*Markman* proposal to include the phrase "necessary to maintain the context of the user session." But this definition now merely rephrases the basic concept at the heart of the patent. The term "context" is even used by the patent as a way of describing what state is. *See* '108 Patent, col.1 ll.31–34 ("Without a way to manage state, between web transactions the system will have 'forgotten' information about the user and the context of the session."). It is not necessary to complicate the jury's task in this case with yet another defined phrase, particularly when that definition only repeats the explanation of the core concept introduced in the first column of the patent. *See U.S. Surgical Corp.*, 103 F.3d at 1568 (claims construction "is not an obligatory exercise in redundancy").

Defendants' real concern appears to be with Global Sessions's proposed construction, but the Court has not adopted that construction, either. The parties agree state was a well-understood concept at the time of the invention. Their arguments now are not arguments about the *scope* of what state means, but rather are arguments about whether particular implementations of the invention adequately track enough state variables to allow the system to remember the necessary context of the user session. *See O2 Micro*, 521 F.3d at 1362 (claims construction not required when issue is "the proper application of a claim term to an accused process rather than the scope of the term"). These are infringement arguments, not claim construction arguments. This objection is OVERRULED.

## 2.    "single set of session data representing a state of a user session" and "single set of session data representing the state of a user session"

The Special Master recommended these terms be construed as: "One set of information reflecting the history during the 'user session' of the user's requests and the responsive webpages. This set may exist in both a master copy and multiple shadow copies." Global Sessions objects to

this construction, arguing the phrase "the user's requests and the responsive webpages" has no support in the record. As an alternative construction, Global Sessions suggests the construction should read "reflecting the history during the 'user session' of the current user session."

Global Sessions correctly notes the phrase "user's requests and responsive webpages" does not appear in the patents-in-suit. Instead, the patents explain state as "reflect[ing] the history of the current user session." '108 Patent, col.2 ll.5–6. The patents also explain the process the invention uses for modifying the session state data used to determine a user's state:

> Session data representing a state of the user session is stored in memory in a global session server. Then, for each subsequent request associated with the user session, the subsequent request is received, and the session data is retrieved from the global session server. The subsequent request is then processed using the session data to provide a web page to the user, and the session data is changed to reflect the processing. The session data is again updated in the global session server. The global session server thereby stores session data unique to each user session accumulated over multiple web transactions.

*Id.* col 1. ll.48–59; *see also id.*, Claim 1 ("processing the subsequent request at the web system engine using the session data to provide a web page to the user; changing the session data to reflect the processing; and updating the single set of session data in the global session server according to the changed session data").

This process is accurately reflected in the Special Master's recommended construction. The process of tracking state involves: (1) receiving a request from a user, (2) retrieving session data, (3) processing the request using the session data, which includes providing a web page to the user, (4) changing the session data "to reflect the processing," and (5) updating the session data in the global session server. The "history" of any user's session thus includes information about what that user requested, and what the server provided in response. The patent expressly states the session data is

"changed to reflect the processing" that occurs when the request is processed "to provide a web page to the user." Reflecting that processing includes reflecting information about the webpages provided in response to user requests. If the server is not tracking what the user receives in response to its requests, the server may lose important aspects of the "context" of that user's interactions with the website.[4] This objection is OVERRULED.

### 3.    "web system engine"

The Special Master recommended this term be construed as: "One or more components of a web system forming a unit that services requests dynamically for web content from users and returns web pages in response." Defendants object to this construction and request the construction be modified to read "forming a unit that *is required to service* requests dynamically."

The parties agree, and the Special Master recognized at the *Markman* hearing, a web system engine must necessarily possess all constituent parts necessary to perform the functions of a web system engine. *See* Markman Tr. [#51], at 42–43 (Special Master Bayer: "And if I'm trying to provide services, to be able to provide those services, doesn't that necessarily imply that within the web system engine, whatever it takes to provide those services is required. . . . I don't understand why required even needs to be in there. Why isn't it implicit?"); Pl.'s Post-*Markman* Op. Br. [#52], at 4 ("Indeed, those elements that are required to perform as a web system engine *are* implied: the web system engine would not function if the elements necessary for it to function did not work together properly."). Defendants' proposed "required" language is implicit in the proposed construction.

---

[4] Global Sessions's alternative proposed construction is consistent with this understanding, but is less helpful to the jury because it makes no effort to explain the concept of history. The Special Master's recommended construction is therefore preferable.

Defendants nevertheless argue the "required" language should be added to avoid jury confusion when Global Sessions inevitably argues a "web system engine" which does *not* contain everything required to dynamically service requests still infringes. Of course, any such argument to the jury would not be a valid infringement argument, and the Court highly doubts competent counsel would advance such an argument in this Court. What lawyer closes a breach of contract case by arguing to the jury only three of the four required elements were proven by the evidence at trial? If Defendants' counsel are faced with such stunning advocacy at trial in this matter, the Court has full confidence they will be able to zealously represent their clients' interests using the Court's jury instructions and the Special Master's recommended construction. This objection is OVERRULED.

4.     **"global session server" and "session server"**

The Special Master recommended these terms be construed as: "Server that stores and provides session data and that is sufficiently separate from the web system engines of the web system, either physically or logically, such that the web system engines remain stateless." Global Sessions has objected to the Special Master's recommended construction of these terms, which adopts the Defendants' position from post-*Markman* briefing. Global Sessions originally proposed the term be construed as: "a centralized or distributed server that stores and provides session data, which is accessible by multiple web system engines."[5] In post-*Markman* briefing, Global Sessions proposed a different construction: "server in memory that is logically separate from the web system engines and that stores and provides session data." Global Sessions raises three specific objections

---

[5] This original construction was also adopted in a preliminary order by another district court construing Global Sessions' patents. *See* Pl.'s Op. Br. [#40-7], Ex. F (provisional claim construction order in *Global Sessions LP v. Travelocity.com LP*, No. 6:10cv671 LED-JDL (E.D. Tex. June 25, 2012)), at 4. The parties generally view the Eastern District court's provisional order, which contains constructions but no analysis or discussion, as persuasive authority when helpful to their positions in this litigation, and otherwise unpersuasive.

to the Special Master's recommended construction: (1) the omission of the phrase "in memory"; (2) the inclusion of the word "physically"; and (3) the inclusion of the phrase "such that the web system engines remain stateless."

Global Sessions contends the phrase "in memory," which it did not propose in its original construction and which was not included in the provisional order entered in the prior litigation, is necessary to prevent some other server physically separate from the web system engines from being interpreted as the global session server. On several occasions, the specification speaks of a global session server residing "in memory." *See, e.g.*, '108 Patent col.6 ll.33–36 ("In the implementation of FIGS. **2A** and **2B**, global session server **138** is maintained as a component in memory and stores data items associated with the state of a user session."); *id.* col.7 ll.22–24 ("Each session cache **206** can interface with global session server **208** which is maintained in memory for quick access."); *id.* col. 8 ll.13–15 ("Each session cache **218** can interface with multiple global session servers **220** which is maintained in memory for quick access."). Global Sessions contends these repeated references—apparently discovered by Global Sessions only after two *Markman* hearings—require the addition of the limitation "in memory" to the construction of these terms.

Each of the uses of the phrase "in memory" is describing *one particular embodiment* of an enterprise web system utilizing a global session server. *See id.* col.5 ll.61–63 ("FIGS. **2A** and **2B** are block diagrams of object flow within *one embodiment* of a web system implemented using an enterprise interaction hub." (emphasis added)); *id.* col.7 ll.15–17 ("FIGS. **3A** and **3B** are block diagrams of an enterprise web system that implements a centralized global session server and a distributed global session server."). The specification is careful to repeatedly characterize these various descriptions as individual implementations. There is no suggestion they are exclusive

implementations, nor any suggestion the global session server *must* be located "in memory" for purposes of the invention. The Court has found no evidence in the record indicating an ordinarily skilled artisan would interpret a global session server as being, by definition, "in memory." Importantly, some claims require the global session server to be located "in memory," but others do not. *Compare* '894 Patent, Claim 6 (claiming "[a] web system that maintains a state for a user session," including "a session server accessible by the web system engines"), *with id.*, Claim 9 (requiring each physical computer system to "comprise[] a session server stored in memory"). Global Sessions's construction thus runs afoul of "the well-established principle that a court may not import limitations from the written description into the claims." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998). The Federal Circuit has specifically "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Falana v. Kent State Univ.*, 669 F.3d 1349, 1355 (Fed. Cir. 2012) (internal quotation marks omitted). Where, as here, "there is no suggestion in the intrinsic record that the applicant intended the claims to have the limited scope suggested" by the proposed construction, it is the Court's obligation to "follow the language of the claims, rather than that of the written description." *Id.* (internal quotation marks omitted). When the global session server must be located in memory, the claims say so. This objection is OVERRULED.

Global Sessions's second and third arguments dovetail into a debate over the degree of separation required between the global session server and the web system engine. Although Global Sessions initially argued the patents do not mandate any separation, the parties ultimately agreed some degree of separation is required. Both parties agree logical separation may be enough, in certain circumstances. Global Sessions objects to the Special Master's endorsement of Defendants'

suggestion *physical* separation may also be allowed in some embodiments of the invention. Global Sessions also disputes the notion separation should be defined in terms of the statelessness of the web system engines.

The Court agrees the concept of physical separation is not supported by the intrinsic record. Defendants' counsel conceded at the *Markman* hearing physical separation is not required. *See* Markman Tr. [#51], at 19–20 (Defendants' Counsel: "['Separated'] does not mean they can't be on the same computer. Of course, they could be on the same computer. . . . So logically separate or virtually separate. That's what's required."). Some claims even require physical co-location of the global session server and the web system engine. *See, e.g.*, '894 Patent, Claim 2 ("The method of claim **1**, wherein at least one of the web system engines is implemented on a plurality of physical computer systems."); *id.*, Claim 4 ("The method of claim **2**, wherein each physical computer system comprises a session server stored in memory and holding master or shadow copies of session data for a plurality of user sessions."). Admittedly, these instances of mandatory co-location could potentially be resolved by the inclusion of the word "or" in the construction, so long as logical separation was maintained.

Defendants' renewed argument for physical separation, however, is unpersuasive. Defendants argue a prior art reference known as *Smith* shows logical separation alone is sometimes insufficient. The *Smith* patent stored session data in separate files. The patentee allegedly distinguished *Smith* on the grounds it did not contain a global session server. Defendants then make a leap of logic and presume it was *Smith*'s file-storage mechanism which precluded the existence of a global session server. But Defendants have not identified anything in the prosecution history, or anywhere else in the record, showing *Smith* was distinguished on that basis. Nor do they offer any argument as to why

file-based separation could not qualify as "logical" separation. Moreover, nothing in the patents-in-suit suggests state data is stored in "files;" to the contrary, the patents state session data "is stored in memory in a global session server." '894 Patent, Abstract. Defendants separately argue a software partition on a hard drive could adequately separate (logically, but not physically) the two components, but make no effort to distinguish this partitioning from simple file separation. The Court SUSTAINS this objection and modifies the Special Master's proposed construction to eliminate the reference to physical separation.

The final and more substantive dispute is over the inclusion of the phrase "such that the web system remain stateless." Global Sessions argues this phrase improperly imports a limitation from the specification into the claims. The Court disagrees. A critical aspect of the invention is the offloading of state-tracking responsibilities from the web system engine to the global session server. The problem identified in the prior art was the stateless nature of HTTP and the unwieldy solution of tracking state on individual web servers. *See* '108 Patent col.1 ll.23–36. The patents specifically attempt to solve this problem, explaining:

> A technical advantage of the use of the global session server is that it allows a web system engine to remain stateless with respect to an ongoing user interaction with the web system. This ability to remain stateless frees web system engine to effectively manage server load balancing and other speed issues. Further, by separating the state information from important enterprise data (which can be stored in secured databases), the global session server allows the web system engine to more quickly associated a state with a particular user request that reflects the history of the current user session.

*Id.* col.1, l.63–col.2, l.6; *see also id.* col.9, ll.53–62. One of the defining characteristics of the invention is thus the use of the global session server to store and track state data in a logically separate location, freeing the web system engine and its web servers to remain stateless and call upon

the global session server when state data is needed to service a user request. If, as Global Sessions suggests, the web system engine is *not* stateless—in other words, if it is still tracking state—the core functionality of the session state patents is lost.[6] This objection is OVERRULED.

The Court adopts the following construction of these terms: "Server that stores and provides session data and that is sufficiently separate from the web system engines of the web system, logically, such that the web system engines remain stateless."

5.      **"existing legacy data"**

The Special Master recommended this term be construed as: "Data created or maintained prior to the user session by a computer system/software outside of the web system." Defendants object and request the construction be modified to read "an antiquated computer system/software."

Defendants argue the Special Master's recommended construction fails to recognize "legacy" data is data maintained in an outdated or antiquated computer system, and essentially reads "legacy" out of the claim. The patents offer no explanation of what the term "legacy" means, and neither party has identified any relevant intrinsic evidence bearing on the subject. Global Sessions's expert testified an ordinarily skilled artisan would have understood the term "legacy data" to refer to "data that has been created by a system external to the one being discussed (*i.e.*, the 'legacy system')—in other words, the term 'legacy' is relative to 'something else.'" Pl.'s Op. Br. [#40-10], Ex. 2 (Gupta Decl.), ¶ 21. This data would also have necessarily been created "prior to the user session." *Id.* ¶ 23. Defendants rely on a general purpose dictionary from the year 2000 for the definition of "legacy,"

---

[6] Global Sessions alternatively suggests the Court should expand the Special Master's recommended construction to include the entire phrase, "allows a web system engine to remain stateless with respect to an ongoing user interaction with the web system." This additional language is superfluous because state as a concept exists only by reference to user interactions with a web system. The only purpose state serves is to track the context of user interactions with a system, so there is no distinction between a stateless web system and a web system merely stateless "with respect to an ongoing user interaction with the web system."

meaning "of or pertaining to old or outdated computer hardware, software, or data that, while still functional, does not work well with up-to-date systems." Def.'s Op. Br. [#41], Ex. O.

The Court agrees the Special Master's recommended construction accurately captures the meaning of the term "existing legacy data" for two reasons. First, the thrust of the patents' use of this term is to identify preexisting data somewhere else in the system, which can be drawn into the interaction hub by the integration layer. *See* '220 Patent, col.1 ll.58–61 ("An integration layer is coupled to the business layer and interfaces with existing legacy data to provide the legacy data to the business layer."); *id.* col.4 ll.17–20 ("Integration layer **18** allows the system to tie into a wide array of existing legacy applications, databases and third party software present in enterprise space **26** and ISV space **28**."). Second, the terms proposed by Defendants—old, antiquated, and outdated—are nebulous and invite indefiniteness disputes because neither the patents nor Defendants' construction explains how old or outdated a system must be in order to satisfy the claim term. *See Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed. Cir. 1990) ("[C]laims are generally construed so as to sustain their validity, if possible."). Although Defendants' counsel assured the Special Master "outdated" means something more than the "difference between iPhone 4 and iPhone 5," the Court has not found any evidence in the record explaining how an ordinarily skilled artisan would have interpreted a phrase like "outdated" when trying to practice, or avoid infringing, the patented invention. *See* Markman Tr. [#51], at 142. As the Special Master explained, the language proffered by Defendants is "just not precise." Markman Tr. [#51], at 149. In a field where technology rapidly changes, including ill-defined words like "outdated" offers no help to the

jurors who will ultimately hear this case, all of whom may have their own views of when technology becomes outdated.[7]

Although the Special Master's recommended construction does not describe "legacy" in terms of being old, outdated, or antiquated, it does not read "legacy" out of the claim entirely. As both the patents and Global Sessions's expert explained, legacy data is data which exists on some preexisting system outside the web system of the invention. Tying the creation of the data to both a time ("prior to the user session") and place ("a computer system/software outside the web system") will allow jurors to conclude whether data qualifies as "existing legacy data" or not.[8]

Finally, Defendants also argue Global Sessions is judicially estopped from advancing a proposed construction of this term which does *not* include the word "outdated" because they proposed a construction including that word in previous litigation. In the *Travelocity* case, Global Sessions proposed the following construction of this term: "data pre-existing the user requests that is old or outdated or stored using old or outdated computer hardware or software, which is accessed through the use of an integration layer." Pl.'s Op. Br. [#40-7], Ex. 1-F, at 6. The court provisionally construed the term as "data created or maintained by an outdated computer system/software that may

---

[7] Imagine, for example, a preexisting system using version 1.0 of a particular software program. The developer then releases version 1.1 of the software, rendering version 1.0 "outdated." Under Defendants' proposed construction, this system might be transformed into a legacy system by the release of the update, and then transformed back into a non-legacy system once the update is applied. The Court has seen no evidence suggesting "legacy," as that term is used in the patent and was understood by ordinarily skilled artisans at the time, is so fluid. Instead, the evidence suggests "legacy" is a referential term referring to preexisting, external systems, regardless of whether they are formally "outdated" or "antiquated."

[8] Defendants previously argued Global Sessions's construction would impermissibly allow legacy data to be created immediately prior to a user session being initiated, which is inconsistent with the concept of legacy data. Not so. The legacy systems accessed by the integration layer are still functional, and there is no evidence such legacy systems cannot continue to both maintain and create new data.

still be in use." *Id.* The court expressly reserved the right to modify its provisional order when entering a final claim construction order. *Id.* The parties settled before a final order was entered.

The doctrine of judicial estoppel is flexible in its application, but is generally applied when three circumstances are met: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) (internal quotation marks omitted). Still, the doctrine is an equitable one, "'invoked by a court at its discretion,'" and "different considerations 'may inform the doctrine's application in specific factual contexts.'" *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001)). Here, although Defendants' proposed construction tracks the language of the *Travelocity* court's provisional order, the Court declines to hold Global Sessions is judicially estopped from challenging that construction. The *Travelocity* court did not adopt Global Sessions's proposed construction, it drafted its own construction. It incorporated the term "outdated," but not the term "old," which Global Sessions had also proposed. The court's provisional construction also said nothing about the preexisting nature of the data, which was also part of Global Sessions's construction. Additionally, the provisional order was expressly open to reconsideration, which never occurred because the parties settled before a final order was entered. That provisional construction is not binding on anyone. Moreover, the parties in this case both used the court's provisional order as a sword and a shield, touting it as persuasive authority when constructions lined up but dismissing it as unpersuasive when advancing a different construction. *See* Markman Tr. [#51], at 6 (Special Master Bayer: "I'm just shocked that both sides find [the provisional order] incredibly authoritative on some terms and totally bunk on

other terms."). Based on the record before this Court, which includes unchallenged expert testimony not presented to the *Travelocity* court, Global Sessions should not be estopped from assisting the Court in construing this claim term without the use of ill-defined terms like "outdated." These objections are OVERRULED.

### Conclusion

The parties' objections to the Special Master's recommended constructions are OVERRULED IN PART and SUSTAINED IN PART, as described in this order, and the Special Master's recommended constructions are ACCEPTED AS MODIFIED.

Accordingly,

IT IS ORDERED that Plaintiffs Global Sessions LP and Global Sessions Holdings SRL's Objections [#59] are OVERRULED IN PART and SUSTAINED IN PART;

IT IS FURTHER ORDERED that Comerica Bank, TD Bank Group, Toronto-Dominion Bank, TD Bank US Holding Company, and TD Bank, N.A.'s Objections [#60] are OVERRULED;

IT IS FINALLY ORDERED that the Amended Report and Recommendation of the Special Master [#58] is ACCEPTED AS MODIFIED. The following chart lists the Court's construction of the disputed claim terms:

| Claim Term | Court's Construction |
|---|---|
| "a state of a user session"<br>and<br>"a state of the user session"<br><br>('108 Patent, Claims 1, 12; '894 Patent, Claims 1, 5–6, 10–12) | No construction necessary. |

| | |
|---|---|
| "single set of session data representing a state of the user session"<br>and<br>"single set of session data representing a state of the user session"<br><br>('108 Patent, Claims 1, 12; '894 Patent, Claims 5, 10, 12) | One set of information reflecting the history during the "user session" of the user's requests and the responsive webpages. This set may exist in both a master copy and multiple shadow copies. |
| "global session server"<br>and<br>"session server"<br><br>('108 Patent, Claims 1, 6, 10, 12, 17, 21; '894 Patent, Claims 5, 6, 10, 12) | Server that stores and provides session data and that is sufficiently separate from the web system engines of the web system, logically, such that the web system engines remain stateless. |
| "web system engine"<br><br>('108 Patent, Claims 1, 9, 12, 20; '894 Patent, Claims 1, 2, 5–7, 10–12) | One or more components of a web system forming a unit that services requests dynamically for web content from users and returns web pages in response. |
| "layer"<br><br>('220 Patent, Claims 1, 4–6; '249 Patent, Claims 1–4, 6, 9, 12) | An identifiable component or an identifiable set of associated components configured to perform an identified function; where each identified layer is functionally insulated from other identified layers. |
| "business layer"<br><br>('220 Patent, Claims 1, 5; '249 Patent, Claims 1, 2, 6, 9, 12) | The layer that provides the business logic for the web system. |
| "business logic"<br><br>('220 Patent, Claim 1; '249 Patent, Claims 1–2, 6, 9) | Business rules of the web system. |
| "session state information"<br><br>('220 Patent, Claim 8) | No construction necessary. |

| "existing legacy data"<br><br>('220 Patent, Claim 1; '249 Patent, Claim 1, 4, 7, 10) | Data created or maintained prior to the user session by a computer system/software outside of the web system. |
| --- | --- |
| "profile data"<br><br>('220 Patent, Claim 1; '249 Patent, Claims 1, 2, 6, 9) | Collection of data reflecting users' interests and interactions with the web system. |
| "historical information"<br><br>('220 Patent, Claim 1; '249 Patent, Claims 1, 2, 6, 9) | No construction necessary. |

SIGNED this the ___8th___ day of September 2014.

SAM SPARKS
UNITED STATES DISTRICT JUDGE